IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

Slep-Tone Entertainment Corporation, a North Carolina Corporation, and Phoenix Entertainment Partners, LLC, a North Carolina Limited Liability Company

       Plaintiffs,

v.

The Basket Case Pub, Inc., an Illinois Corporation, and Dannette Rumsey
       Defendants.

Case No.: 15-CV-1009

## COMPLAINT

The Plaintiffs, Slep-Tone Entertainment Corporation ("Slep-Tone") and Phoenix Entertainment Partners, LLC ("Phoenix"), by their undersigned counsel, hereby complain of Defendant The Basket Case Pub Inc. and Defendant Dannette Rumsey, and for their Complaint hereby alleges as follows:

### JURISDICTION AND VENUE

1. This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2. This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to Plaintiffs' Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

1

3. This Court has supplemental jurisdiction over the subject matter of Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of Illinois and within this judicial district.

5. This Court has both specific and general personal jurisdiction over each Defendant, in that each of them resides in this State and federal judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFFS

6. Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Pineville, North Carolina, and plaintiff Phoenix is a North Carolina limited liability company having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7. Defendant The Basket Case Pub Inc. is an Illinois corporation having its principal place of business in Peoria, Illinois. Defendant The Basket Case Pub Inc. operates an eating and drinking establishment known as "The Basket Case" in Peoria, Illinois. Defendant The Basket Case Pub Inc., provides karaoke entertainment at the venue.

8. Defendant Dannette Rumsey is a resident of Morton, Illinois, and based on information and belief the sole owner and president of The Basket Case Pub Inc.

## BACKGROUND FACTS

9. Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

10. The basic premise of a karaoke show is that the entity hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

11. Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information. The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

12. Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

13. The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

14. Phoenix is the owner of SOUND CHOICE, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

15. Phoenix has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand.

16. Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs

known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

17. SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers. According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

18. The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

19. SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

20. Slep-Tone and its successor Phoenix have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

21. Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

22. In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

23. In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from an original, provided that the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.

24. The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

25. Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

26. Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

27. Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

28. In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2009, Slep-Tone instituted a Media Shifting Policy ("MSP")—which Phoenix has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

29. That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

30. That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

31. For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

32. The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

33. The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

34. Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

35. This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

36. Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

37. None of these activities are conducted with Phoenix's authorization, and none of these activities are accompanied by any sort of payment to Phoenix.

38. Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

39. Legitimate KJs spend thousands of dollars acquiring Plaintiffs's accompaniment tracks, an irreducible overhead cost that must be recovered over a significant number of engagements.

40. Illegitimate KJs, including these Defendants, have an unfair advantage over legitimate KJs, because the illegitimate KJs are able to provide karaoke services with a considerably lower overhead cost and significantly more songs through the pirating of Plaintiffs's tracks.

41. In order to build a large library of Plaintiffs's accompaniment tracks, a legitimate KJ could expect to spend approximately $25,000 for each karaoke system upon which that library would be used. For a comprehensive library of Plaintiffs's accompaniment tracks, that figure would rise to $40,000 or more.

## **THE RIGHTS OF THE PLAINTIFFS**

42. Phoenix is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

43. Phoenix is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

44. For the entire time the marks identified above ("the Sound Choice Marks") have been federally registered, Plaintiffs have provided the public, including the Defendants, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

45. Principally, the Sound Choice Marks are indicators of Plaintiffs as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by Plaintiffs or at their direction and under their control.

46. Phoenix is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress"). This distinctive and protectable trade dress includes, at a minimum, (1) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (2) the Sound Choice Marks; and (3) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

47. Plaintiffs have used their trade dress continuously and substantially exclusively for a period of decades.

48. The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Plaintiffs as a source, effectively functioning as a visual trademark.

49. The aforementioned trade dress serves to distinguish Plaintiffs' tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of

8

identifying a particular karaoke track as originating with Plaintiffs simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

50. The elements of the Trade Dress represent specific design choices by the Plaintiffs; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

51. No competitor of Plaintiffs is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiffs' known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF THE DEFENDANTS

52. Defendants provide karaoke entertainment at their venue The Basket Case in Peoria, Illinois.

53. On information and belief, Defendants provide karaoke shows seven days a week at the aforesaid venue.

54. On information and belief, the venue owns karaoke equipment, i.e., lap tops, external hard drives, speakers, microphone, etc., to provide karaoke entertainment.

55. On information and belief, Defendants utilize several individuals to facilitate the karaoke shows.

56. On information and belief, in order to provide services, rather than using original karaoke discs that it possesses (if it indeed possesses such discs), Defendants rely upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

57. On information and belief, Defendants rely upon at least one such computer hard drive described in paragraph 54 herein.

58. On information and belief, Defendants create, or direct another to create, or otherwise acquired from a third party the files that are stored on its computer hard drive(s).

59. On information and belief, Defendants did not pay royalties or fees to Plaintiffs or to upstream owners of copyright in the underlying musical works for the privilege of conducting their duplicative activities.

60. Defendants did not pay any royalties or fees to Plaintiffs for the privilege of displaying the Sound Choice Marks during the karaoke shows.

61. On information and belief, Defendants do not maintain a 1:1 correspondence relationship between their hard drives and original discs they has lawfully acquired, if they have acquired any.

62. Plaintiffs did not authorize, cause, control, or know about the creation of the files stored on the Defendants' computer hard drives at the time those files were so stored.

63. Rather, on information and belief, the files were created by or at the behest of the Defendants, or by a third party unknown to Plaintiffs. The party who created the files is the "origin" of the files for purposes of the Trademark Act.

64. On information and belief, many of the files stored on the Defendants' computer hard drives are representative of karaoke tracks originally created by Plaintiffs and are marked with the Sound Choice Marks.

65. When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

66. Plaintiffs did not authorize the Defendants to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

67. As such, the placement of the Sound Choice Marks and the Trade Dress upon the Defendants' self-created computer files is a false designation of the origin of those computer files.

68. At all times relevant to the causes of action stated herein, the Defendants have known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

69. Defendants' files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

70. A patron or unwitting customer of the Defendants, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of the Defendants' shows, is likely to be confused into believing, falsely, that Plaintiffs created the tracks in use or authorized their creation.

71. On information and belief, Defendants' activities are not isolated or sporadic occurrences, but are instead regular activities undertaken over a long period of time, in some cases months.

72. Defendants' use of the computer files representative of karaoke accompaniment tracks is commercial in nature because they are paid to provide access to and play those computer files and tracks at karaoke shows.

73. Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Defendants are compensated and which inures to its benefit.

74. Defendants' piracy of accompaniment tracks is not limited to Plaintiffs' tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

**DAMAGES**

75. Defendants' unauthorized use of the Plaintiffs's trademarks has damaged Plaintiffs.

76. Defendants damaged Plaintiffs in an amount to be proven at trial but not less than $25,000 for each karaoke system they own or operate and which contains karaoke tracks that infringe the Sound Choice Marks as detailed above, based upon their foregone purchases of original media.

77. Defendants enjoy revenues attributable in substantial part to their use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

78. Defendants' illicit activities have also allowed it to compete unfairly against Plaintiffs' legitimate customers by lowering its cost of doing business through piracy of the music materials it uses.

79. Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which the Defendants operate by helping to crowd higher-cost but legitimate operators out of the market.

80. Defendants' acts deprived Plaintiffs of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

# FIRST CLAIM FOR RELIEF
## TRADEMARK AND TRADE DRESS INFRINGEMENT
### (Against All Defendants)

81. Plaintiffs repeat and incorporate by reference herein their allegations contained in Paragraphs 1-80 of this Complaint.

82. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

83. Use of the Sound Choice Marks and the Trade Dress by Defendants were "in commerce" within the meaning of the Trademark Act of 1946 as amended.

84. Plaintiffs did not license Defendants to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection with the provision of their services.

85. Use of the Sound Choice Marks and the Trade Dress by Defendants in this manner is likely to cause confusion, or to cause mistake, or to deceive their customers and patrons into believing that their services are being provided with the authorization of Plaintiffs and that their music libraries contain bona fide Sound Choice accompaniment tracks.

86. On information and belief, the acts of Defendants were willful, knowing, and intentional.

87. Plaintiffs have been damaged by these infringing activities.

88. Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to Plaintiffs.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**(Against All Defendants)**

89. Plaintiffs repeat and incorporate by reference herein their allegations contained in Paragraphs 1-88 of this Complaint.

90. On each occasion Defendants caused or permitted an unauthorized counterfeit duplicate of Plaintiffs' accompaniment track to be played during a karaoke show at a given establishment, the Sound Choice Marks and the Trade Dress were displayed in connection with the Defendants' karaoke services.

91. The display of the Sound Choice Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Plaintiffs manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved the Defendants' services and commercial activities.

92. The display of the Sound Choice Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Plaintiffs and purchased or otherwise licensed by Defendants.

93. Defendants' use of Plaintiffs's marks and trade dress in this fashion or in a more appropriate fashion would have inured to the benefit of Plaintiffs if Defendants had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that Plaintiffs would have received revenue from such sales.

94. Because Plaintiffs have been denied this revenue, it has been damaged by Defendants' uses.

95. On each occasion when Defendants caused or permitted an accompaniment track pirated from a manufacturer other than Plaintiffs to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with the Defendants' karaoke services.

96. Upon information and belief, Defendants' use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact Defendants or an upstream but unauthorized provider of the track was the origin of that track.

97. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Defendants acquired in a legitimate manner.

98. The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Defendants.

99. Defendants' use of the false designations of origin in this fashion damages Plaintiffs by enabling Defendants to provide or obtain karaoke services at a lower cost than persons who acquire those materials legitimately, including Plaintiffs' legitimate customers, can provide or obtain them.

100. The consequential denial of revenue from a legitimate market for Plaintiffs' customers' services prevents Plaintiffs' customers from making purchases of material from Plaintiffs and is thus a denial of revenue to Plaintiffs.

101. Because Plaintiffs have been denied this revenue, it has been damaged by Defendants' false designations of origin relating to other manufacturers.

102. Unless enjoined by the Court, the Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to Plaintiffs.

### THIRD CLAIM FOR RELIEF
### ILLINOIS DECEPTIVE TRADE PRACTICES ACT
**(Against All Defendants)**

103. Plaintiffs repeat and incorporate by reference herein their allegations contained in Paragraphs 1-102 of this Complaint.

104. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

105. Defendants' acts of infringement occurred during the conduct of trade or commerce, from which Defendants derived an economic benefit.

106. Defendants' acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

107. Defendants' acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by Plaintiffs.

108. As a direct and proximate result of the Defendants' acts of infringement Plaintiffs have suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Defendants' acts in creating or acquiring counterfeits of Plaintiffs' accompaniment tracks.

109. As such, Plaintiffs have been damaged and is likely to be further damaged by a deceptive trade practice of Defendants within the meaning of 815 ILCS § 510/3.

110. Unless enjoined by the Court, Defendants' unfair competition activities as described above will continue unabated and will continue to cause harm to Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**(Against All Defendants)**

111. Plaintiffs repeat and incorporate by reference herein their allegations contained in Paragraphs 1- 110 of this Complaint.

112. Defendants used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

113. Defendants' use of the Sound Choice Marks and the Trade Dress was "in commerce" within the meaning ascribed by Illinois common law.

114. Plaintiffs did not license Defendants to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks or the Trade Dress in connection with the services provided at its night club.

115. Use of the Sound Choice Marks and the Trade Dress in the manner attributable to the Defendants is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which the Defendants performs into believing that the services those customers are receiving are being provided with the authorization of the Plaintiffs using bona fide, legitimate, authorized karaoke accompaniment tracks.

116. Defendants' acts were willful and knowing.

117. Plaintiffs have been damaged by infringing activities of Defendants.

118. Unless enjoined by the Court, Defendants' infringing activities as described above will continue unabated and will continue to cause harm to Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against each of the Defendants, and that the Court:

A. Find that Defendants committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B. Find that Defendants engaged in unfair competition detrimental to Plaintiffs in violation of 15 U.S.C. § 1125(a);

C. Enter judgment against Defendants and in favor of Plaintiffs on all applicable counts;

D. Find the Defendants' activities were in all respects conducted willfully and for profit;

E. Award to Plaintiffs Defendants' profits and the damages sustained by Plaintiffs because of Defendants' conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to Two Million and no/100 Dollars ($2,000,000.00) per mark infringed, per Defendant and in any event in an amount not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system operated by Defendants, and not less than Fifty Thousand and no/100 Dollars ($50,000.00) for each establishment in which the infringement occurred;

F. Award to Plaintiffs Defendants' profits and the damages sustained by Plaintiffs because of the Defendants' acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $25,000 for each karaoke system operated by Defendants, and not less than $50,000 for each establishment in which the infringement occurred;

G. Award to Plaintiffs treble, punitive, or otherwise enhanced damages, as available, for Defendants' acts of willful infringement;

H. Order all computer disks, drives, or other media belonging to Defendants, which media contain counterfeits of Plaintiffs' marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

I. Grant Plaintiffs preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by Defendants;

J. Grant Plaintiffs preliminary and permanent injunctive relief against further false designations of origin by Defendants with respect to words, names, and symbols associated with other manufacturers;

K. Award Plaintiffs its costs suit and attorney fees, to the extent not awarded above; and

L. Grant Plaintiffs such other and further relief as justice may require.

Respectfully submitted this the 27th day of April, 2015.

Respectfully Submitted,

/s/ Konrad Sherinian
An Attorney for Plaintiffs

Attorneys for Plaintiffs Slep-Tone and Phoenix:

Konrad Sherinian
Depeng (Edward) Bi
The Law Offices of Konrad Sherinian, LLC
1755 Park Street, Suite #200
Naperville, IL 60563
Phone: (630) 318-2606
Fax: (630) 318-2605
Email: ksherinian@sherinianlaw.net
Email: ebi@sherinianlaw.net