# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

SLEP-TONE ENTERTAINMENT )
CORPORATION, a North Carolina )
Corporation, )
           )
       Plaintiff, )
           )
          v. )      Case No.   15-cv-1009
           )
THE BASKET CASE PUB, INC., an )
Illinois Corporation, and DANNETTE )
RUMSEY, )
           )
       Defendants. )

# O R D E R   A N D   O P I N I O N

This matter is before the Court on Defendants' Motion to Dismiss. (Doc. 22). For the reasons stated below, the motion is GRANTED in part. Also pending is Plaintiff's Motion For An Extension Of Time To Have Their Response To Defendants' Motion To Dismiss Accepted (Doc. 30). That motion is also GRANTED. Also pending before this Court is Defendants/Counter-Plaintiffs' Motion To Strike Plaintiffs/Counterdefendants' Affirmative Defenses (Doc. 32). For the reasons that will be discussed herein, that motion is DENIED as moot.

### FACTUAL BACKGROUND[1]

Slep-Tone Entertainment Corporation ("Slep-Tone") was the manufacturer and distributor of karaoke accompaniment tracks sold under the trademark "Sound

---

[1] Unless otherwise noted, the Court draws the facts in this section from the Second Amended Complaint (Doc. 20), treating the Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, in accordance with the motion to dismiss standard described infra at p. 6.

Choice". Phoenix Entertainment Partners, LLC ("Phoenix") is the corporate successor to Slep-Tone. Together they will be referred to as the "Plaintiffs".[2] A "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information. The graphical component is synchronized to the music and is displayed to the patron who is performing, and typically, to the crowd as well. Plaintiffs sell their products primarily on CD+G discs but more recently, also on MP3+G media. The "+G" refers to the fact that these media are enhanced with graphics. The CD+G discs require special players that are capable of decoding the CD+G format. Technology has advanced such that the karaoke tracks stored on the CD+G and MP3+G formats can be decoded and copied to computer hard drives or other storage devices. These "media-shifted copies" have been duplicated from the original media and written to non-original media. Karaoke operators now have the ability to store a large number of karaoke accompaniment tracks on hard drives for convenient transport to their karaoke shows, without also carrying large numbers of compact discs. Karaoke operators have also used the available technology to copy one purchased disc to two or more computer systems for simultaneous use; to copy their patrons' discs to the operator's computer hard drive at a show; to "swap" song files with other operators;

---

[2] Although Plaintiffs allege that Phoenix is the owner of the marks and has succeeded Slep-Tone as to all rights in the Sound Choice ® brand, they nonetheless maintain Slep-Tone as a separate and distinct entity in this lawsuit. If the Court were disallowing the motion to dismiss and allowing this suit to proceed, it would inquiry further into whether Slep-Tone is a real party-in-interest to this suit. But since the motion to dismiss will be granted and this action dismissed with prejudice, the point is moot.

to obtain and share karaoke tracks via file-sharing sites and torrents (files sent through what is called the BitTorrent protocol, which allows multiple computers to transfer a single file); to purchase computer hard drives that were pre-loaded with copies of karaoke tracks; and to sell[3] off their original media in a secondary market once they have copied tracks to a hard drive.

Plaintiffs permit karaoke operators, such as Defendants, to use purchased CD+G discs to provide karaoke services to patrons under certain conditions. However, Plaintiffs have a media-shifting policy ("MSP") that imposes mandatory rules for karaoke operators who use media-shifted copies of Sound Choice® karaoke tracks to provide commercial karaoke services. The MSP requires compliance with four conditions: (1) 1:1 ("one-to-one") correspondence, meaning that for every media-shifted Sound Choice® karaoke track on a given medium such as a computer hard drive, the operator owns and maintains possession of a lawful original Sound Choice® karaoke track on its original medium, on a one-copy-for-one-original basis; (2) that the original media that form the basis for 1:1 correspondence are placed "on the shelf," i.e., not used for any purpose at all; (3) that the operator notify Plaintiffs that he or she has media-shifted karaoke tracks; and (4) that the operator submit to and be certified as having passed an audit of the operator's systems to verify complete compliance with the MSP. Nevertheless, karaoke operators have used the available technology to copy one purchased disc to two or more computer systems for simultaneous use and other similarly unauthorized uses disallowed by the MSP.

---

[3] Plaintiffs do not allege these particular Defendants have sold any CD+G discs, MP3+G media or media-shifted copies of Plaintiffs' discs in a secondary market.

Plaintiffs pay statutory and negotiated royalties to the owners of copyright in the underlying musical works for its legitimate creation, copying, distribution, and sales of compact discs containing karaoke accompaniment tracks. Unfortunately, Plaintiffs have become victimized by the widespread creation, distribution, and commercial use of counterfeit copies of Plaintiffs' karaoke discs. For each of the several recent releases of new karaoke tracks by Plaintiffs, dozens of illegitimate copies of the contents of the disc have been created. Plaintiffs have lost a considerable amount of money due to this widespread piracy.

Phoenix is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark Sound Choice®, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions." Phoenix is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows: for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

Plaintiffs have, for the entire time its marks identified above have been federally registered, provided the public with notice of those federal registrations through the consistent display of the symbol ® with its marks as used. Principally, the Sound Choice® Marks are indicators of Plaintiffs as the origin of karaoke accompaniment tracks, which means that those marks indicate that the tracks to which they are applied were made and distributed by Plaintiffs or at their direction and under their control. Plaintiffs are the owner of their trade dress. This

distinctive and protectable trade dress includes, at a minimum, (1) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (2) the Sound Choice® Marks; and (3) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue. Plaintiffs have used their trade dress continuously and substantially exclusively for a period of decades. The aforementioned trade dress serves to distinguish Plaintiffs' tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with Plaintiffs simply by examining the trade dress or any significant portion thereof, whether or not the Sound Choice® Marks are also displayed.

Defendants provide karaoke entertainment at their venue, The Basket Case, in Peoria, Illinois. In order to provide these services, rather than using original karaoke CD+G discs or MP3+G media, Defendants rely upon one or more computer hard drives that store files containing karaoke accompaniment tracks. Defendants did not pay royalties or fees to Plaintiffs or to the owners of copyright in the underlying musical works for the privilege of using these materials. Defendants did not pay any royalties or fees to Plaintiffs for the privilege of displaying the Sound Choice® Marks during their karaoke shows.

Moreover, Defendants do not comply with the MSP. The karaoke tracks used by Defendants at their venue were created by or at the behest of the Defendants, or by a third party unknown to Plaintiff. The files stored on the Defendants' computer hard drives are representative of karaoke tracks originally created by Plaintiffs and

are marked with the Sound Choice® Marks. When played as intended using appropriate software, those files cause the Sound Choice® Marks and the distinctive and protectable trade dress associated with marks to be displayed as part of the associated video component of the karaoke tracks they represent. Slep-Tone did not authorize the Defendants to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice® Marks or the trade dress. The Defendants know that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice® Marks and/or the trade dress was not authorized by Slep-Tone. A patron or unwitting customer of the Defendants, when confronted with the display of the Sound Choice® Marks and the trade dress at one of the Defendants' shows, is likely to believe that Plaintiffs created the tracks in use or authorized their creation.

## LEGAL STANDARDS

In ruling on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), "the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re marchFIRST Inc.*, 589 F.3d 901, 904 (7th Cir. 2009). The pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, the challenged pleading must contain sufficient detail to give notice of the claim, and the allegations must "plausibly suggest that the [non-movant] has a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plausibility standard requires enough facts "to present a story that holds together," but does not require a determination of probability. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Though detailed factual allegations are not needed, a "formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545.

DISCUSSION

As an initial matter, Plaintiffs state they are willing to dismiss all charges against Dannette Rumsey without prejudice to their ability to refile an amended complaint against her in the event discovery should warrant her being returned to the case. Such concession is unnecessary because the federal claims against the Defendants are not cognizable under the law and the Court declines to exercise its supplemental jurisdiction over the remaining state law claims.

I.  **Plaintiffs' Federal Claims Are Not Barred By *Dastar Corporation v. Twentieth Century Fox Film Corporation.***

As described by the Supreme Court in *Dastar Corporation v. Twentieth Century Fox Film Corporation*, the Lanham Act "was intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in … commerce against unfair competition." 539 U.S. 23, 28 (2003) (internal quotations and citations omitted). The Lanham Act, as codified in the United States Code, provides in relevant part that

> (1) Any person who shall, without the consent of the registrant--
>
>> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or

services on or in connection **with which such use is likely to cause confusion, or to cause mistake, or to deceive**; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is **likely to cause confusion, or to cause mistake, or to deceive**,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114. Moreover, the statute also provides

(a) Civil action

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

**(A)** is **likely to cause confusion, or to cause mistake, or to deceive** as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125.

In *Dastar*, the court was concerned with 15 U.S.C. § 1125(a). 539 U.S. at 25.

The relevant facts are as follows: Fox owned the television rights of a television

series but allowed the copyright in the television series to lapse. *Id.* at 26. Dastar bought videotapes of the television series years later, copied them, edited the series and marketed and sold the videos, which utilized much, if not all, of the video footage originally contained in the Fox videos. *Id*. The question presented in *Dastar* was whether Dastar violated the trademark rights of Fox under the Lanham Act by "marketing and selling its own product without acknowledging its nearly wholesale reliance on Fox's product." *Id.* at 31. In other words, Dastar was selling videos that largely incorporated Fox's intellectual property under Dastar's marks without giving the public any indication that its videos were making use of Fox's intellectual property. Fox's theory of liability was that Dastar's video contained a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... [was] likely to cause confusion ... as to the origin ... of [Dastar's] goods" because the video footage came from Fox's videos but was being sold by Dastar under Dastar's trademarks. *Id.*

The Supreme Court rejected Fox's arguments and explained that Dastar had merely taken "a creative work in the public domain . . . copied it, made modifications (arguably minor), and produced its very own series of videotapes." *Id.* The Court held that the phrase "origin of goods" as used in the Lanham Act "refers to the <u>producer of the tangible goods that are offered for sale</u>, and not to the author of any idea, concept, or communication embodied in those goods." 539 U.S. at 37 (emphasis added). As "the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods," *id.*, Dastar was held to be the origin of its own videos and

the holder of its own marks and so Fox could not maintain a Lanham Act claim under § 1125(a). *Id.* at 38. The Seventh Circuit interprets *Dastar* to instruct that litigants are "not to use trademark law to achieve what copyright law forbids. Only a <u>confusion about origin</u> supports a trademark claim, and 'origin' for this purpose means the 'producer of the tangible product sold in the marketplace.'" *Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 872 (7th Cir. 2013) (emphasis added), quoting 539 U.S. at 31.[4]

Plaintiffs argue that they are alleging Defendants copied and used the Sound Choice® trademarks without Plaintiffs' permission in violation of the Lanham Act. Plaintiffs' specific claims here are that Defendants are making unauthorized uses of their trademarks, not that Defendants have failed to attribute Plaintiffs for the materials on the karaoke tracks. Given those specific allegations, the Court agrees with Plaintiffs that *Dastar* and its progeny do not directly foreclose their claims against Defendants because Plaintiffs are not seeking to enforce copyright rights via the Lanham Act. Nevertheless, the Court is left to determine whether Plaintiffs have pled the requisite elements of actionable Lanham Act claims.

## II. Plaintiffs Have Not Pled Allegations That Demonstrate Defendants' Use Of Media Shifted or Format Shifted Copies Of Plaintiffs' Karaoke Tracks Will Lead To A Likelihood Of Confusion.

As stated earlier, the Lanham Act "was intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in ...

---

[4] As will be explained in more detail later in this Order and Opinion, there are no allegations in the Second Amended Complaint that make it plausible a consumer would view the karaoke tracks at issue and conclude that anyone other than Plaintiff created them and was being credited for creating them.

commerce against unfair competition." 539 U.S. at 28 (internal quotations and citations omitted). The hallmark of trademark protection is to "prevent consumer deception and confusion." *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). Thus, in both claims under sections 1114 and 1125, a plaintiff must plead facts that make it plausible the defendant's <u>use of the trademark</u> is <u>likely to cause confusion</u> among consumers. *Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993) ("the central issue is the likelihood of consumers in *the relevant market* confusing the infringer's mark with that of the complainant." (emphasis added)).

This case does touch upon consumer confusion through the unfair use of a trademark at all. Instead, this is really a case about piracy, theft, and Defendants dishonoring Plaintiffs' MSP. Plaintiffs allege it produces karaoke tracks that it sells on discs and mp3s to karaoke operators. (Doc. 20 at ¶ 20). Defendants are karaoke operators who are in the business of providing a venue where karaoke tracks are played as a service to entice patrons to patronize their establishment and buy their liquor and ancillary pub fare. (Doc. 20 at ¶¶7, 12-13). There is no basis to conclude that Plaintiffs and Defendants are engaged in the same business or even in competition with one another.[5]

---

[5] While it is true that companies need not be in direct competition in order to find that an infringer's unfair competition has harmed the Lanham Act plaintiff; there still must be some showing that the plaintiff has suffered an injury to its commercial interests "proximately caused" by the would-be infringer's deceptions. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (U.S. 2014). In the Second Amended Complaint, Plaintiffs allege "Defendants' use of the false designations of origin . . . damages Plaintiffs by enabling Defendants to provide or obtain karaoke services at a lower cost than persons who acquire those materials legitimately, including Plaintiffs' legitimate customers, can provide or

There are no allegations in the Second Amended Complaint that Defendants sell or otherwise distribute their stored media-shifted/ format shifted copies of the karaoke tracks to the public at large or even their own customers who visit their pub. The allegations in the Second Amended Complaint are that these tracks are played or made available to be played at the Defendants' venue; not sold. (Doc. 20 at ¶ 12 ("Venues that offer karaoke entertainment do so primarily as a free service. . . .")). Thus, there are no plausible allegations that Defendants are "producers of the tangible product sold in the marketplace", which are necessary elements of Lanham Act claims under *Eastland Music Grp., LLC*, 707 F.3d 869, and *Dastar*, 539 U.S. 23. In short, the allegations of the Second Amended Complaint merely suffice to establish that Defendants used or are using Plaintiffs' product without authorization under the MSP; not selling Plaintiffs' karaoke tracks as their own in a marketplace. The Lanham Act is concerned with the latter conduct, not the former.

Moreover, the Second Amended Complaint makes clear that Plaintiffs are the unquestionable origin of the karaoke tracks at issue here and Defendants' alleged activities are not capable of diminishing or otherwise confusing a consumer's perception of the origin of the tracks. Slep-Tone itself states "the Sound Choice Marks are indicators of Plaintiffs as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were

---

obtain them." This in turn is alleged to have caused "[t]he consequential denial of revenue from a legitimate market for Plaintiffs' customers' services" and prevent "Plaintiffs' customers from making purchases of material from Plaintiffs and is thus a denial of revenue to Plaintiffs." (Doc. 20 at ¶¶ 99-100). This pathway of causation from the alleged activities of the Defendants (and others like them) to Plaintiffs' damages can hardly be characterized as proximate, which means the cause of something is close or immediate.

made and distributed by Plaintiffs or at its direction and under its control." (Doc. 20 at ¶ 45). "**Patrons are often unable to distinguish the imitation from an original**." (Doc. 1 at ¶ 32 (emphasis added)). Thus, Plaintiffs' allegations make it abundantly clear that the Defendants' patrons are viewing a screen that displays Plaintiffs' marks when the karaoke tracks at issue are played. If, as Plaintiffs allege, the counterfeit tracks are virtually indistinguishable to the bar patrons from the original tracks and display of Plaintiffs' marks indicate to the viewer Plaintiffs' ownership of the tracks, then there can be no confusion. This is because the viewers would see Plaintiffs' marks and associate Plaintiffs as the tracks' origin. The Second Amended Complaint provides no basis for this Court to conclude customers would credit the bar owner with creating the tracks. Nor is there any basis to conclude that anyone other than Plaintiffs created the tracks. In short, these allegations undermine any notion that the Defendants are trying to pass off the karaoke tracks as originating from anyone other than Plaintiffs.

The parties both attempt to discuss whether the traditional factors involved in a likelihood-of-confusion analysis are satisfied here, yet such factors do not fit the facts of this case. The Seventh Circuit has outlined the following several factors for use in determining the likelihood of consumer confusion: "(1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the complainant's mark, (6) any evidence of actual confusion, and (7) the defendant's intent (or lack thereof) to palm off its

product as that of another." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461-62 (7th Cir. 2000). These factors do not apply in this case.

For example, there are no allegations in the Second Amended Complaint that Defendants are displaying competing marks of their own, so only Plaintiffs' marks are at issue here. Similarly, there is only one product at issue—the karaoke tracks—and there are no allegations that Defendants are selling, marketing or otherwise distributing their media/format shifted copies of Plaintiffs' tracks to the public. Furthermore, the allegations of the Second Amended Complaint affirm that Defendants have not taken any steps to try to "palm off" Plaintiffs' tracks as their own; if anything, their display of Plaintiffs' marks has the salutary effect of clearly identifying the origin of tracks to the end using Basket Case Pub patron. *Slep-Tone Entm't Corp. v. Canton Phoenix Inc.*, No. 3:14-CV-764-PK, 2014 WL 5824787, at *10 (D. Or. Sept. 4, 2014) *report and recommendation adopted as modified*, No. 3:14-CV-00764-PK, 2014 WL 5817903 (D. Or. Nov. 7, 2014). In short, there can be no likelihood of confusion at issue in this case because there are no issues of confusion, competing marks or competing products.

## III. *Dastar*'s Hypothetical Does Not Sanction Plaintiffs' Trademark Claims Against Defendants.

In support of its opposition to the motion to dismiss, Plaintiffs cite a few Northern District of Illinois opinions in which the courts found *Dastar* did not foreclose its Lanham Act claims against other karaoke bar owners/operators. To be clear, this Court agrees with those courts on that discrete issue. Given *Dastar*'s limited holding—claims arising under 15 U.S.C. § 1125(a) do not extend to claims of

unaccredited copying of uncopyrighted work—the Court does not find that Plaintiffs' Lanham Act claims are foreclosed by *Dastar*.

Nevertheless, the Court is aware that those district courts have also allowed Plaintiffs to proceed with similar claims against other karaoke venue owners with reference to *Dastar*. *See, e.g., Slep-Tone Entm't Corp. v. Sellis Enterprises, Inc.*, No. 13 C 08070, 2015 WL 1593498 (N.D. Ill. Apr. 3, 2015); *Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 711 (N.D. Ill. 2014); *Slep-Tone Entm't Corp. v. Elwood Enterprises, Inc.*, No. 13 C 7346, 2014 WL 1612891 (N.D. Ill. Apr. 21, 2014); *Slep-Tone Entm't Corp. v. America's Bar & Grill, LLC*, No. 13 C 8526, 2014 WL 4057442, at *3 (N.D. Ill. Aug. 15, 2014).

Having read those cases, it is evident that those courts are operating under the impression that defendants are creating a new good in the marketplace by shifting the karaoke tracks from one medium to another. *E.g., Sellis Enters.*, 2015 WL 1593498 at *5 ("The media and format shifting operates as an independent creation event, placing a new 'good' in the marketplace."). In coming to that conclusion, those courts rely on *obiter dictum* expressed in the *Dastar* opinion that "had defendant bought some of plaintiff's videotapes and 'merely repackaged them as its own," "this would have been a proper false designation of origin claim." 539 U.S. at 31. The Court does not conclude that this statement can be construed to allow Plaintiffs' claims here to proceed for the following two reasons.

First, what the Court did not state in its hypothetical, but should nevertheless be apparent from its context, is that the hypothetical repackaged videos would necessarily have to be sold in a marketplace or otherwise distributed

to consumers in a marketplace in order for there to be an actionable Lanham Act infringement violation. This is the crucial point that distinguishes Defendants' actions from the hypothetical infringement discussed in *Dastar*—Defendants are not alleged to be selling or advertising or otherwise distributing their media shifted copies of Plaintiffs' karaoke tracks to anyone, whereas the hypothetical seller in *Dastar* was understood to be selling the repackaged videos.[6]

Second, the idea that a new good has been created merely by shifting the tracks from a disk to a hard drive is deeply flawed. In *Sellis Enters.*, for example, the court wrote:

> if an individual were to take a Slep–Tone CD and copy the tracks onto another CD, it is difficult to dispute that a new good has been made, a good that Slep–Tone did not create. . . . [M]edia- and format-shifting creates a new tangible good of which Slep–Tone is *not* the original producer. Because the producer of the new good (karaoke jockeys) and the mark-holder of the mark on the goods (Slep-Tone) do not match, the alleged use of Slep-Tone's mark on the copied tracks is a false designation of origin covered by the Lanham Act.

*Sellis Enters.*, 2015 WL 1593498 at *5. This argument ignores that the object of value desired by the bar patrons and karaoke operators alike is not the particular medium upon which the track is presented for consumption; rather, it is the underlying tracks themselves. The particular medium upon which the tracks are stored is meaningless. *Canton Phoenix Inc.*, 2014 WL 5817903, at *2 ("The relevant "good" in this case are the karaoke tracks themselves, and not the means by which those goods are stored (e.g. CD vs. hard drive)"). Plaintiffs have not alleged that

---

[6] McCarthy on Trademarks and Unfair Competition regards the hypothetical to be nothing more than an affirmation of the familiar use of 1125(a) claims to reach instances where one party "buys a product of another and falsely claims to have 'produced' or 'manufactured' the goods." § 27:78 (4th ed.).

karaoke bar patrons give any concern whatsoever to how the tracks are stored or to who created the tracks with which the patrons are singing along.[7]

Furthermore, the argument that Defendants have created some new product in the marketplace also ignores the clear import of *Dastar*'s holding, which is that "[o]nly a confusion about origin supports a trademark claim, and 'origin' for this purpose means the 'producer of the tangible product <u>sold</u> in the marketplace.'" *Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 872 (7th Cir.) (emphasis added), quoting 539 U.S. at 31. Again, this Second Amended Complaint does not allege that Defendants are selling the media shifted copies of the karaoke tracks in a marketplace.

Consequently, the Court finds that the Second Amended Complaint does not allege a likelihood-of-confusion and does not state a cognizable claim of trademark or trade dress infringement or unfair competition against the Defendants under §§ 32 and 43 of the Trademark Act of 1946 codified at 15 U.S.C. §§ 1114 and 1125. Counts I and II are dismissed.

---

[7] To be clear, Plaintiffs do not allege that Defendants' piracy has caused the quality of the tracks to be degraded such that consumers are viewing Plaintiffs' marks displayed by the media shifted copies and are left with the impression that Plaintiffs produce inferior karaoke tracks. (*See* Doc. 20 at ¶¶22-23). Such allegations would not be logical anyway in light of Plaintiff's allegations that the popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist and provide highly accurate singing cues as part of the video display; characteristics Plaintiffs allege are highly valued by karaoke singers. (Doc. 20 at ¶¶ 18-19). If karaoke operators such as Defendants were offering inferior quality tracks, then karaoke singers would ultimately abandon such operators over time in favor of operators who chose to provide the tracks by way of the high quality CD+G discs.

When a court dismisses a claim pursuant to a Rule 12(b)(6) motion, the dismissal must be with prejudice because the claim is not one upon which relief can be granted. *Remijas v. Neiman Marcus Grp., LLC*, No. 14-3122, 2015 WL 4394814, at *8 (7th Cir. July 20, 2015) ("A dismissal under Rule 12(b)(6), in contrast, is a dismissal with prejudice."); *Kamelgard v. Macura*, 585 F.3d 334, 339 (7th Cir. 2009). Therefore, the Plaintiffs' Counts I and II are dismissed with prejudice. The Court expresses no judgment as to the propriety of Counts III and IV, Illinois state law claims, because the Court declines to exercise its supplemental jurisdiction under 28 U.S.C. § 1367(c).

## IV. Defendants/Counter-Plaintiffs' Counterclaims Are Dismissed With Prejudice.

Having dismissed the federal claims and declined to exercise supplemental jurisdiction over the Illinois state law claims, the Court is left to determine what to do with the Defendants/Counter-plaintiffs' counterclaims (Doc. 21). Generally, the dismissal of a complaint does not necessarily require dismissal of counterclaims. However, jurisdiction under Article III of the Constitution must always be satisfied, and such jurisdiction requires an actual case or controversy between the parties. *Flast v. Cohen*, 392 U.S. 83, 94 (1968). This requirement extends to claims brought under the Declaratory Judgment Act, 28 U.S.C. § 2201, *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239-40 (1937), which Defendants/Counter-plaintiffs cite as the source of their counterclaims. (Doc. 21 at 2). The counterclaims are as follows: In Count I, Defendants/Counter-plaintiffs seek a judgment that Plaintiffs' marks are invalid and unenforceable and should be

cancelled pursuant to 15 U.S.C. § 1119. (Doc. 21 at 5). In Count II, they seek the same relief under a theory that Plaintiffs have failed to supervise the licensing of their product. (Doc. 21 at 6). In Count III, Defendants/Counter-plaintiffs seek the same relief under a theory that Plaintiffs have abandoned the marks. (Doc. 21 at 6). Finally, in Count IV, they seek a judgment that Plaintiffs' purported trade dress features are not protectable.

These counterclaims must be dismissed at this point because there is no longer an actual controversy between the parties. Plaintiffs' suit alleged infringement of trademarks and trade dress. (Doc. 20 at 14-15). Defendants/Counter-plaintiffs' counterclaims are all really nothing more than affirmative defenses to Plaintiffs' claims in that their purpose is to avoid liability for the trademark and trade dress liability and unequivocally seek cancellation of the marks under the Lanham Act. The Court has ruled that Plaintiffs cannot enforce the marks *sub judice* against these Defendants for the complained conduct under the Lanham Act. Thus, Defendants need not fear any further litigation (save appellate litigation) based upon Lanham Act claims from the Plaintiffs for their use of media shifted copies of the karaoke tracks.

In a particularly instructive case from the Northern District of Illinois, the district court dismissed a counterclaim with prejudice requesting cancellation of a trademark pursuant to 15 U.S.C. § 1119 after the plaintiff voluntarily dismissed its infringement and unfair competition claims based upon on the same mark. *CIBER, Inc. v. CIBER Consulting, Inc.*, 326 F. Supp. 2d 886 (N.D. Ill. 2004). The *CIBER* court found that the dismissal of the plaintiff's claims with prejudice barred any

suit based on the defendants' current or past use of the mark at issue and that in the absence of such an infringement suit, or the threat of such a suit, there was no justiciable case or controversy. *Id.* at 889.

Similar circumstances exist here. The Court's dismissal of the federal claims is with prejudice, which has the effect of barring any suit based on the Defendants' current or past alleged use of the mark at issue. *See Kamelgard*, 585 F.3d at 339 ("A dismissal for failure to state a claim is a dismissal on the merits, Fed.R.Civ.P. 41(b), unless the dismissal order states otherwise; and a dismissal on the merits is normally with prejudice and thus a bar to relitigation."). Therefore, there is no justiciable case or controversy left here because there is no longer a real threat of an infringement suit based upon the conduct at issue in this lawsuit and the Court may properly dismiss the counterclaims with prejudice.

## CONCLUSION

Defendant's Motion to Dismiss (Doc. 22) is GRANTED as to Counts I and II of the Second Amended Complaint ONLY. The Court expresses no judgment as to the propriety of Counts III and IV, Illinois state law claims. The Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). Defendants/Counter-plaintiffs' counterclaims are also DISMISSED with prejudice and Defendants/Counter-Plaintiffs' Motion To Strike Plaintiffs/Counterdefendants' Affirmative Defenses (Doc. 32) is DENIED as moot.

CASE TERMINATED

IT IS SO ORDERED.

Entered this 4th day of August, 2015.

                                        s/ Joe B. McDade
                                    JOE BILLY McDADE
                                United States Senior District Judge